# Illinois Official Reports

## Appellate Court

*Sanders v. Illinois Union Insurance Co.*, 2019 IL App (1st) 180158

| | |
|---|---|
| Appellate Court Caption | RODELL SANDERS and THE CITY OF CHICAGO HEIGHTS, Plaintiffs-Appellants, v. ILLINOIS UNION INSURANCE COMPANY and STARR INDEMNITY & LIABILITY COMPANY, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-18-0158 |
| Filed | January 15, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CH-02605; the Hon. Celia Gamrath, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Loevy & Loevy, of Chicago (Michael Kanovitz, Russell R. Ainsworth, and Tony Balkissoon, of counsel), for appellant Rodell Sanders.<br><br>Scariano, Himes & Petrarca, Chtrd., of Chicago (Paulette A. Petretti and Darcee C. Williams, of counsel), for other appellant.<br><br>Walker Wilcox Matousek LLP, of Chicago (Christopher A. Wadley, of counsel), for appellee Illinois Union Insurance Co.<br><br>Traub Lieberman Straus & Shrewsberry LLP, of Chicago (Brandt W. Allen, of counsel), for other appellee. |

| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. |
| | Justice Hyman concurred in the judgment and opinion. |
| | Presiding Justice Mason dissented, with opinion. |

**OPINION**

¶ 1     Plaintiffs, Rodell Sanders and City of Chicago Heights (City), appeal from the trial court's dismissal with prejudice of their second amended complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2016)). On appeal, plaintiffs argue that the trial court erred in concluding that the insurance policies issued by defendants, Illinois Union Insurance Company (Illinois Union) and Starr Indemnity & Liability Company (Starr), did not provide coverage for Sanders's underlying claim of malicious prosecution against the City (*Sanders* suit). For the reasons that follow, we reverse and remand.

¶ 2                                         BACKGROUND

¶ 3     In the *Sanders* suit, filed in the federal court, Sanders brought, among others, a claim of malicious prosecution against the City and some of its employees. In it, Sanders alleged that members of the City's police department manipulated and coerced false witness identifications of Sanders as being involved in a December 1993 shooting. Sanders also alleged that members of the City's police department made false statements to prosecutors to encourage his prosecution, fabricated evidence, and withheld exculpatory information in connection with his prosecution for the shooting. As a result, Sanders alleged, he was wrongly convicted of murder, attempt (murder), and armed robbery arising out of that shooting

¶ 4     The *Sanders* suit ultimately settled for $15 million. Under the terms of the settlement, the City agreed to pay $2 million of the settlement and United National Insurance Company, the City's insurer at the time Sanders was initially charged with the crimes, agreed to pay $3 million. The City also assigned to Sanders its rights to pursue recovery from defendants, the City's other insurers.

¶ 5     Pursuant to that assignment, Sanders became a plaintiff in the present action, joined by the City. In their second amended complaint in the present action, plaintiffs alleged that Sanders was sentenced to 55 years' imprisonment on the murder conviction, to run consecutively to his 25-year sentence on the attempt (murder) conviction and concurrently with his 20-year sentence on the armed robbery conviction. In January 2011, Sanders's convictions were vacated and that ruling was affirmed by the Illinois Appellate Court in May 2012. *People v. Sanders*, 2012 IL App (1st) 110373-U. In 2013, Sanders was retried, which resulted in a mistrial. He was retried again in July 2014, at which time he was finally acquitted.

¶ 6     The second amended complaint in the present action further alleged that Illinois Union issued primary insurance policies to the City that were collectively in effect for the period of November 1, 2010, through November 1, 2014. Starr issued excess insurance policies to the

City that collectively were in effect from November 1, 2011, through November 1, 2014.[1] Despite the City's repeated demands for coverage for the *Sanders* suit, Illinois Union and Starr denied coverage and refused to contribute to the settlement of the *Sanders* suit. As a result, plaintiffs alleged claims for breach of contract and improper claims practices and sought a declaratory judgment that defendants owed coverage under their respective policies for the claims made in the *Sanders* suit.

¶ 7 Defendants filed a motion to dismiss the second amended complaint pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2016)). In it, they argued that their policies did not provide coverage for the claims in the *Sanders* suit because the trigger for coverage under the policies was the filing of the criminal charges against Sanders, an act that took place before defendants' policies went into effect. Defendants further argued that the retrials of Sanders did not qualify as additional coverage triggers because they were simply continuations of the original 1994 prosecution. In response, plaintiffs argued that because defendants' policies provided coverage for the "offense" of malicious prosecution, the coverage trigger was not the filing of the criminal charges against Sanders but was, instead, the completed tort of malicious prosecution. Here, all of the elements of Sanders's claim for malicious prosecution were alleged to have been met upon his exoneration in 2014. The plaintiffs also argued that, even if coverage were triggered by the wrongful conduct of the City's police officers and not Sanders's exoneration, then the retrials of Sanders, which occurred while defendants' policies were in effect, were additional triggers for coverage.

¶ 8 After a hearing on the matter, the trial court issued its memorandum opinion and order, granting defendants' motion to dismiss. In doing so, the trial court found that the language of the policies, in conjunction with existing case law, dictated the conclusion that coverage for a malicious prosecution claim under defendants' policies was triggered by the initiation of Sanders's prosecution, not his subsequent exoneration. The trial court also rejected plaintiffs' argument that the retrials of Sanders were additional triggers of coverage, instead concluding that they were merely a continuation of the original prosecution.

¶ 9 Following the trial court's dismissal of the second amended complaint, plaintiffs filed this timely appeal.

¶ 10 ANALYSIS

¶ 11 On appeal, plaintiffs argue that the trial court erred in dismissing the second amended complaint on the basis that the coverage trigger—the filing of the criminal charges against Sanders—occurred outside the effective dates of defendants' policies. Plaintiffs argue that the language of the policies requires a conclusion that coverage was not triggered until the tort of malicious prosecution was complete, *i.e.*, Sanders was exonerated, which occurred while defendants' policies were in effect. Alternatively, plaintiffs argue that even if it was the wrongful conduct of the City, and not the satisfaction of the elements of the malicious prosecution, that triggered coverage under defendants' policies, then Sanders's retrials during the effective dates of defendants' policies triggered coverage. For the reasons that follow, we conclude that coverage under the policies was triggered upon the completion of the tort of

---

[1]Plaintiffs attached to their second amended complaint only defendants' policies covering the period of November 1, 2012, through November 1, 2014, and focused primarily on those policies in their allegations against defendants.

malicious prosecution, *i.e.*, Sanders's exoneration, which occurred while the policies were in effect. Accordingly, the trial court's dismissal of plaintiffs' second amended complaint must be reversed and the matter remanded for further proceedings.

¶ 12 Defendants' motion to dismiss was brought pursuant to section 2-619(a)(9) of the Code (*id.*), which provides for the dismissal of a complaint on the basis that "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." In making such a motion, the movant admits the legal sufficiency of the complaint but asserts that an affirmative defense or some other matter defeats the claims contained therein. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). We review dismissals under section 2-619(a)(9) *de novo*. *Id.* at 368.

¶ 13 The propriety of the trial court's dismissal of plaintiffs' second amended complaint turns on the interpretation of the insurance policies issued by defendants, namely, whether coverage under those policies is triggered by the initiation of the alleged malicious prosecution or the exoneration of Sanders. Although plaintiffs alleged in their second amended complaint that Illinois Union's policies covered the collective period of November 1, 2010, through November 1, 2014, and Starr's policies covered a collective period of November 1, 2011, through November 1, 2014, plaintiffs' focus on appeal is on defendants' policies covering the period of November 1, 2012, through November 1, 2014, the policies in effect during Sanders's retrials. Accordingly, our focus will be the same.

¶ 14 Our supreme court has summarized the principles governing our interpretation of insurance policies:

"Because an insurance policy is a contract, the rules applicable to contract interpretation govern the interpretation of an insurance policy. [Citations.] Our primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language. [Citations.] If the language is unambiguous, the provision will be applied as written, unless it contravenes public policy. [Citations.] The rule that policy provisions limiting an insurer's liability will be construed liberally in favor of coverage only applies where the provision is ambiguous. [Citations.] A policy provision is not rendered ambiguous simply because the parties disagree as to its meaning. [Citation.] Rather, an ambiguity will be found where the policy language is susceptible to more than one reasonable interpretation. [Citations.] While we will not strain to find an ambiguity where none exists [citation], neither will we adopt an interpretation which rests on 'gossamer distinctions' that the average person, for whom the policy is written, cannot be expected to understand [citation]." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010).

¶ 15 In its policies, Illinois Union agreed to the following:

"The *Insurer* will indemnify the *Insured* for *Damages* and *Claim Expenses* in excess of the *Retained Limit* for which the *Insured* becomes legally obligated to pay because of a *Claim* first arising out of an *Occurrence* happening during the *Policy Period* in the Coverage Territory for *Bodily Injury, Personal Injury, Advertising Injury,* or *Property Damage* taking place during the *Policy Period*." (Emphases in original.)

With respect to "Personal Injury," "Occurrence" is defined under the Illinois Union policies as "only those offenses specified in the *Personal Injury* Definition." (Emphasis in original.) The definition of "Personal Injury" provides:

"*Personal Injury* means one or more of the following offenses:

a. False arrest, false imprisonment, wrongful detention or malicious prosecution;

b. Libel, slander, defamation of character, or oral or written publication of material that violates a person's right of privacy, unless arising out of advertising activities in electronic chat rooms or bulletin boards;

c. Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of the owner, landlord or lessor, or by a person claiming to be acting on behalf of the owner, landlord or lessor." (Emphasis in original.)

¶ 16        The Starr policies, as excess policies, essentially follow the terms of the primary policies issued by Illinois Union. In other words, subject to specific terms and exclusions that are not relevant here, if coverage under the Illinois Union policies is triggered, excess coverage under the Starr policies is also triggered.

¶ 17        None of the parties dispute that the above provisions require the "offense" of malicious prosecution to take place during the relevant policy periods.[2] Rather, the dispute centers around when the "offense" of malicious prosecution is deemed to occur under the policies. According to plaintiffs, because the policies define an occurrence as the "offense" of malicious prosecution, the policies refer to the completed tort of malicious prosecution and, thus, the "offense" of malicious prosecution does not happen until all the elements of the tort of malicious prosecution are satisfied. In Sanders's situation, the tort elements of malicious prosecution were not complete until he was exonerated in 2014. See *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 99 (2004) ("A cause of action for malicious prosecution does not accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor."). At that point, according to plaintiffs, the offense of malicious prosecution "happen[ed]" and coverage was triggered under defendants' policies. In contrast, defendants argue that the "offense" of malicious prosecution is not the completed tort of malicious prosecution but is the offensive act of maliciously prosecuting someone, *i.e.*, charging someone with malice and without probable cause. Thus, coverage is triggered by initiation of the alleged malicious prosecution.

¶ 18        None of defendants' policies define the term "offense." In situations where an insurance policy does not define a term, that term is to be given its plain and ordinary meaning, and courts often refer to dictionaries in making this determination. *Muller v. Firemen's Fund Insurance Co.*, 289 Ill. App. 3d 719, 725 (1997). Black's Law Dictionary defines "offense" as "[a] violation of the law; a crime, often a minor one." Black's Law Dictionary (10th ed. 2014). This definition suggests that the term "offense" refers to the legal cause of action that arises out of wrongful conduct, not just the wrongful conduct itself. After all, crimes and other violations of law, like tort causes of action, are typically comprised of a number of elements, only one of which is the wrongful act itself. The crime, legal violation, and tort cause of action does not arise or exist until all those elements have been satisfied; thus, only upon completion of the final element is a wrongful act transformed into a crime or a tort.

___

[2]The insuring agreement of the Illinois Union policies requires that the "*Occurrence* happen[ ] during the *Policy Period*." (Emphases in original.) An occurrence is any "offense" listed in the personal injury definition. The definition of personal injury lists malicious prosecution as one of the qualifying offenses. Thus, the offense of malicious prosecution must happen during the policy period.

¶ 19    Although defendants advance other definitions of "offense" that are more favorable to them, the other language of the Illinois Union policies supports a conclusion that the term "offense" refers to the legal cause of action for malicious prosecution, not the underlying wrongful conduct giving rise to a legal cause of action for malicious prosecution. As noted, the Illinois Union policies define "personal injury" by reference to a list of "offenses." Importantly, this list of offenses refers exclusively to legal causes of actions by their proper, legal names, *e.g.*, false arrest, false imprisonment, malicious prosecution, libel, defamation, wrongful eviction, etc. Nowhere in the policies' list of offenses does it refer to the underlying wrongful acts themselves, *i.e.*, arresting, imprisoning, or prosecuting someone without probable cause; telling lies about someone; or physically removing someone from a property. The policies' reference to the offenses by their proper, legal names instead of by their underlying wrongful conduct makes clear that coverage is triggered by the occurrence of the completed cause of action (in this case, upon Sanders's exoneration) and not by merely the underlying wrongful conduct. See *Milwaukee Guardian Insurance, Inc. v. Taraska*, 236 Ill. App. 3d 973, 975 (1992) ("[T]he provisions of an insurance policy should be read and interpreted as an integrated whole, not as isolated parts.").

¶ 20    We believe such an interpretation is consistent with what the average person would understand to be covered under the Illinois Union policies. For the reasons discussed above, the average person, reading that the Illinois Union policies provided coverage for the "offenses" of false arrest, malicious prosecution, libel, wrongful eviction, etc., would believe that the policies provided coverage for the legal claims of false arrest, malicious prosecution, libel, wrongful eviction, etc. The average person would have no reason to think that although the "offenses" were identified by the proper, legal names of whole causes of action, they actually only were intended to refer to the underlying wrongful conduct. Thus, at the point the elements of those causes of actions were met, the average insured would believe that coverage is triggered. Where the term "offense" is coupled with the titles of legal causes of action and does not specifically refer to the base wrongful acts alone, to conclude otherwise would be to "adopt an interpretation which rests on 'gossamer distinctions' that the average person, for whom the policy is written, cannot be expected to understand." *Founders Insurance Co.*, 237 Ill. 2d at 433.

¶ 21    For the above reasons, we conclude that the plain and ordinary meaning of the term "offense," as it is used in relation to "malicious prosecution" in the Illinois Union policies, refers to the completed, legal cause of action of malicious prosecution. The tort of malicious prosecution requires proof of five elements: "(1) the commencement or continuation by the defendant of an original judicial proceeding against the plaintiff; (2) termination of the original proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice; and (5) special damages." *Grundhoefer v. Sorin*, 2014 IL App (1st) 131276, ¶ 11. Here, Sanders's claim for malicious prosecution was not complete until he was exonerated in 2014. See *Ferguson*, 213 Ill. 2d at 99 ("A cause of action for malicious prosecution does not accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor."). Accordingly, coverage under the defendants' policies was not triggered until 2014, when Sanders was acquitted after his third trial.

¶ 22    In opposition, defendants argue that we should follow a line of Illinois cases holding that the triggering event for coverage of a claim of malicious prosecution is the initiation of the alleged malicious prosecution against the claimant. See *First Mercury Insurance Co. v.*

*Ciolino*, 2018 IL App (1st) 171532; *St. Paul Fire & Marine Insurance Co. v. City of Waukegan*, 2017 IL App (2d) 160381; *County of McLean v. States Self-Insurers Risk Retention Group, Inc.*, 2015 IL App (4th) 140628; *Indian Harbor Insurance Co. v. City of Waukegan*, 2015 IL App (2d) 140293; *St. Paul Fire & Marine Insurance Co. v. City of Zion*, 2014 IL App (2d) 131312. Of these cases, three of them are not applicable here because the relevant policy language was markedly different than the language in Illinois Union's policies. Specifically, the policies in these three cases provided that the claimant's injury or the insured's wrongful act must take place during the policy period. See *City of Waukegan*, 2017 IL App (2d) 160381, ¶ 12 (the policy covered " 'injury or damage that *** happens while this agreement is in effect' "); *Indian Harbor*, 2015 IL App (2d) 140293, ¶ 4 (the policy covered " 'damages resulting from a wrongful act(s),' " but required that " '[t]he wrongful act(s) must occur during the policy period' "); *City of Zion*, 2014 IL App (2d) 131312, ¶ 12 (the policy covered an injury or damage that " 'happens while this agreement is in effect' "). Thus, it is no surprise that these courts concluded that the triggering event was the initiation of the wrongful prosecution, as the claimant's injury occurs immediately upon the insured's wrongful act of filing criminal charges with malice and without probable cause. See *City of Zion*, 2014 IL App (2d) 131312, ¶ 23. In this case, however, the Illinois Union policies require the "offense" of malicious prosecution to happen in the policy period, not the injury resulting from or the wrongful act giving rise to malicious prosecution. Accordingly, these cases are irrelevant to our analysis.

¶ 23    Two of the cases cited by defendants contain similar language to the policies in this case: *County of McLean* and *First Mercury*. Nevertheless, we conclude that these cases do not govern our decision in the present case. In *County of McLean*, the policy at issue provided coverage for, among other things, damages from personal injury, so long as the personal injury was " 'the result of an *occurrence* during the *policy period*.' " (Emphases in original.) *County of McLean*, 2015 IL App (4th) 140628, ¶ 16. An occurrence was defined as follows: " 'With respect to *personal injury*, only the offenses defined under *personal injury*. For any claim for *personal injury*, the date of the *occurrence* is the date that the first offense took place or is alleged to have taken place.' " (Emphases in original.) *Id.* ¶ 17. The term personal injury was defined in relevant part as " 'injury (other than *bodily injury* or *property damage*) caused by one or more of the following offenses: 1. False or wrongful arrest, detention, imprisonment[,] or malicious prosecution.' " (Emphases in original.) *Id.*

¶ 24    Despite the fact that the policy in *County of McLean*, like the Illinois Union policies here, plainly required the "occurrence" to take place during the policy period, the court in *County of McLean* improperly read the policy as if it specifically required the claimant's injury to take place during the policy period. The court appears to have reached this conclusion by conflating the definitions of occurrence and personal injury:

    "Construing the terms as a whole, the policy clearly defines 'personal injury' as '*injury *** caused by *** malicious prosecution.' (Emphasis added.) Accordingly, to conclude that the 'occurrence' resulting in Beaman's 'personal injury' happened within the policy period, the *injury caused by* the malicious prosecution must have taken place within the policy period. In other words, the event that triggers coverage is the actual *injury* suffered by the prosecuted party, not the accrual of the *tort* of malicious prosecution." (Emphases in original.) *Id.* ¶ 33.

As this excerpt of the court's analysis demonstrates, although the court correctly recognized that the "occurrence" must take place within the policy period, it incorrectly equated an

occurrence with personal injury, which was defined as an injury caused by malicious prosecution. The policy, however, specifically provided that an occurrence was any of the *offenses* listed in the personal injury definition; it did not provide that an occurrence was the same as a personal injury, *i.e.*, an injury caused by the listed offenses. As a result of this confusion, the court in *County of McLean* focused on the timing of the claimant's injury and did not actually examine when the "offense" of malicious prosecution occurs. Accordingly, although the policy in *County of McLean*, like the Illinois Union policies here, provided that coverage was triggered by the "offense" of malicious prosecution, the court in *County of McLean* interpreted the policy as if it provided that coverage was triggered by the claimant's injury, thereby making the decision irrelevant to our analysis.

¶ 25    That brings us to *First Mercury*, the case on which defendants primarily rely. Like here, the issue presented in *First Mercury* was when coverage was triggered for an underlying claim of malicious prosecution—at the initiation of the allegedly malicious prosecution or at the claimant's exoneration. Also like here, the insurance policy at issue was in effect at the time the claimant in the underlying malicious prosecution suit was exonerated but was not in effect when the claimant was initially charged. *First Mercury*, 2018 IL App (1st) 171532, ¶ 7. The insurance policy provided that the insurer would cover damages because of personal injury " 'caused by an offense arising out of your business *** but only if the offense was committed *** during the policy period.' " *Id.* ¶ 8. The term personal injury was defined as an " 'injury, other than "bodily injury," arising out of one or more of the following offenses.' " *Id.* ¶ 9. Malicious prosecution was included as one of the offenses listed in the definition of personal injury. *Id.* Thus, like in the present case, the insurance policy required that the "offense" of malicious prosecution take place within the policy period, and the parties disagreed about when that was deemed to have occurred. *Id.* ¶ 25.

¶ 26    In answering that question, the *First Mercury* court disagreed with the defendant's contention that the term "offense" referred to the completed tort of malicious prosecution. *Id.* ¶ 29. The court concluded that the use of the word "offense" did not necessarily indicate an intent by the parties that coverage under the policy be triggered only by the completed tort of malicious prosecution. *Id.* ¶ 30. Instead, the court held that a more straightforward reading of the term "offense" was that the policy required the offensive conduct to take place within the policy period. *Id.* "[A]pplying the common and popular understanding of the word," the court concluded that "the policy refers to a wrongful act or conduct committed during the policy period, regardless of whether the elements of a tort have accrued." *Id.* The court also observed that it defied common sense to characterize the exoneration of an innocent person as offensive or wrongful conduct and, thus, interpreting the word "offense" to include exoneration would distort the term's common and popular understanding. *Id.* ¶ 32.

¶ 27    As discussed above, we disagree with the *First Mercury* court's opinion on the common understanding of the term "offense," specifically when it is used to describe a list of legal causes of action and not wrongful acts or misconduct. Even putting that fundamental disagreement aside, we note an important factor that distinguishes the language of the *First Mercury* policy from the language of the Illinois Union policies. The policy in *First Mercury* required the offense to have been "committed" during the policy period, while the Illinois Union policies provide coverage for claims arising out of an occurrence (*i.e.*, the offense) "happening" during the policy period. Merriam-Webster defines "commit" as "to carry into action deliberately: PERPETRATE." Merriam-Webster Online Dictionary, https://www.

- 8 -

merriam-webster.com/dictionary/commit (last visited Jan. 7, 2019) [https://perma.cc/KP7E-NR8H]. In contrast, it defines "happen" as "to occur by chance" and "to come into being or occur as an event, process, or result." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/happen (last visited Jan. 7, 2019) [https://perma.cc/3RKK-DC6X].

¶ 28    As these definitions make clear, the use of the word "commit" denotes an affirmative, deliberative act by a person, whereas the use of the word "happen" suggests the completion of a process or the passive coming into existence of something. Thus, when the term "offense" is read in the context of the *First Mercury* policy, which required that the offense be "committed," it is not unreasonable to conclude that the parties to the policy intended "offense" to refer to an affirmative act by the insured, *i.e.*, the initiation of the wrongful prosecution. In contrast, the Illinois Union policies refer to malicious prosecution "happening" during the policy period, which supports a conclusion that the parties intended "offense" to refer to the completed tort of malicious prosecution and not the initiation of the prosecution. This is because a completed tort "come[s] into being," while, in contrast, the filing of charges is deliberately "carr[ied] into action." Thus, due to this distinction in language and for the other reasons discussed above, we disagree that we are bound by the interpretation of "offense" utilized in *First Mercury*.

¶ 29    Defendants make a number of other arguments in support of their position that warrant discussion. First, defendants, as some of the courts in the above-discussed cases have, argue that the exoneration of a claimant in a wrongful prosecution claim cannot be considered the trigger for coverage because there is nothing offensive about the exoneration. Instead, the exoneration is the judicial system's first step in rectifying the wrong done to the claimant. This argument is without merit because it misstates the coverage trigger. The trigger of coverage is not the exoneration alone but instead is the satisfaction of all the elements of the tort of malicious prosecution. Although it is true that the claimant's exoneration is typically the final element of a claim of malicious prosecution to be met, there is nothing about the exoneration itself that triggers coverage.

¶ 30    Defendants also argue that if coverage is triggered by the completed tort of malicious prosecution, then where the same set of facts give rise to claims for both false arrest and malicious prosecution, it is possible that one insurer would provide coverage for the false arrest claim while a different insurer would cover the malicious prosecution claim. In addition, defendants contend that our interpretation of "offense" puts insurers at risk of having to cover acts that were committed in years past. We do not disagree that these are potential effects of our interpretation, but we do disagree that they render our conclusion incorrect. If defendants or insurers do not wish to subject themselves to these possible effects, it is well within their power—in fact, it rests exclusively within their power—to issue policies that limit or preclude these effects. Specifically, defendants and other insurers are free to redraft their policies to define an occurrence based on the insured's misconduct rather than on the "offense" of malicious prosecution (*i.e.*, the completed tort). In addition, defendants and other insurers are free to include retroactive dates in their policies, thereby limiting their risk of exposure for acts committed in years past.

¶ 31    In sum, we conclude that the language of the Illinois Union policies, when read in context, is plain in providing that coverage is triggered by the "offense" of malicious prosecution "happening" within the policy period and the offense of malicious prosecution only happens

once all of the elements of the tort are met. In the present case, that means that the coverage trigger was Sanders's exoneration in 2014, which was well within the effective periods of the Illinois Union and Starr policies. Thus, the trial court erred when it dismissed plaintiffs' second amended complaint with prejudice.

¶ 32    Because we conclude that Sanders's exoneration triggered coverage under defendants' policies, we need not address plaintiffs' alternative argument that Sanders's retrials were additional triggers for coverage.

¶ 33                                              CONCLUSION

¶ 34    For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and this matter is remanded for further proceedings.

¶ 35    Reversed and remanded.

¶ 36    PRESIDING JUSTICE MASON, dissenting:

¶ 37    I agree with my colleagues that the language of an insurance policy governs its interpretation and that, depending on the policy language, the same occurrence may be covered under one policy and not another. But if the offense of malicious prosecution is not *committed* when the defendant in the underlying case is exonerated (*First Mercury*, 2018 IL App (1st) 171532, ¶¶ 35-36), I see no legal or grammatical reason why, under the insurance policies here, we should conclude that malicious prosecution *happens* or *takes place* upon exoneration. Under the clear and unambiguous language of the Illinois Union/Starr policies, the malicious prosecution of Sanders happened in 1994 when he was wrongfully charged with murder; it did not happen in either 2013, when he was retried, or in 2014, when after his third trial, he was acquitted. Because I believe the trial court properly granted summary judgment to defendants, I respectfully dissent.

¶ 38    Illinois Union agreed to provide coverage for claims arising out of an occurrence (defined, in relevant part, as "those offenses specified in the definition of Personal Injury," including malicious prosecution) "happening" during the policy period for "Personal Injury" (defined to include "malicious prosecution") "taking place" during the policy period. If we substitute "malicious prosecution" in the policy's coverage grant, it provides coverage for "claims arising out of malicious prosecution happening during the policy period for malicious prosecution taking place during the policy period." This language may be redundant, but it is not ambiguous: the occurrence and the personal injury/malicious prosecution giving rise to the claim must happen and take place during the policy period.

¶ 39    To support the conclusion that the offense of malicious prosecution takes place or happens when a defendant is exonerated, my colleagues rely on a definition of "offense" from Black's Law Dictionary, which includes among its definitions "[a] violation of the law; a crime, often a minor one." Black's Law Dictionary (10th ed. 2014). Black's Law Dictionary also defines "offense" as "an intentional unlawful act that causes injury or loss to another and that gives rise to a claim for damages." *Id.* And Merriam-Webster defines offense as "something that outrages the moral or physical senses"; "the act of attacking"; "the act of displeasing or affronting"; or "a breach of moral or social code." Merriam-Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/offense (last visited Jan. 7, 2019) [https://perma.cc/KG27-NBK9].

¶ 40　　In my view, any one of these definitions, including the one relied on by the majority, suggests that an "offense" is the wrongful conduct or unlawful act. It was a "violation of the law" for Chicago Heights police officers to bring false murder charges against Sanders, just as those false charges constituted an "intentional unlawful act" and "something that outrages the moral sense." None of these definitions associates "offense" with a completed tort that triggers the running of the statute of limitation and the concomitant right to sue. See *First Mercury*, 2018 IL App (1st) 171532, ¶ 30.

¶ 41　　The overwhelming weight of authority in Illinois supports the conclusion that it is the commencement of prosecution, and not exoneration, that triggers coverage for malicious prosecution. See *id.* ¶ 35 (concluding that "offense" as used in the policy referred to the insured's wrongful conduct that led to the claimant's conviction rather than the claimant's exoneration, which could not "logically be considered part of an 'injury' to the [claimant]"); *Indian Harbor*, 2015 IL App (2d) 140293, ¶ 24 ("[T]he favorable termination of a malicious prosecution marks the beginning of the judicial system's remediation of the wrong committed, not the commencement of the injury or damage." (Internal quotation marks omitted.)); *City of Waukegan*, 2017 IL App (2d) 160381, ¶ 48 (explaining that "the time of occurrence in insurance law is different from the time of accrual in tort law. In insurance law, the time of occurrence is used to determine when the operative terms of the policy provide coverage. In tort law, the time of accrual is used to determine when the statute of limitations begins to run, a separate consideration ***."); see also *City of Zion*, 2014 IL App (2d) 131312, ¶¶ 12, 26 (claimant charged with murder before inception of policy, but exonerated during policy period not entitled to coverage under policy covering claims for malicious prosecution that " 'happens while this agreement is in effect' "); *County of McLean*, 2015 IL App (4th) 140628, ¶¶ 26, 32-34 (the "occurrence" of the alleged "personal injury" was each underlying plaintiff's "arrest and prosecution, not his exoneration").

¶ 42　　And Illinois is not alone in reaching this conclusion. See *Hampton v. Carter Enterprises, Inc.*, 238 S.W.3d 170, 177 (Mo. Ct. App. 2007) ("offense" of malicious prosecution occurs upon the institution of the underlying action as "[t]hat is the point *** at which the defendant invoked the judicial process against the victim maliciously and without probable cause, causing the victim's injury"); *Zurich Insurance Co. v. Peterson*, 232 Cal. Rptr. 807, 813 (Ct. App. 1986) (the "occurrence" is the filing of criminal complaint, which triggers coverage under insurance policy); *Harbor Insurance Co. v. Central National Insurance Co.*, 211 Cal. Rptr. 902, 907 (Ct. App. 1985) ("[a]lthough favorable termination thus serves to confirm the element of lack of probable cause, the focus of the wrong is upon the institution of the suit, with malice and without such probable cause").

¶ 43　　The results reached in these cases dealing with insurance coverage comport with the point in time at which a prosecution is determined to be "malicious," *i.e.*, at its outset. See *Miller v. Rosenberg*, 196 Ill. 2d 50, 58 (2001) (recognizing that element of claim for malicious prosecution is showing that the defendant "instituted the underlying suit without probable cause and with malice"); *Howard v. Firmand*, 378 Ill. App. 3d 147, 150 (2007) (complaint for malicious prosecution arose out of petition for order of protection: There must be "an *honest* belief by the complainant at the time of subscribing a criminal complaint that another is probably guilty of an offense; it is immaterial that the accused may thereafter be found not

guilty." (Emphasis in original and internal quotation marks omitted.)); *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 72 (2003) ("It is the state of mind of the one commencing the prosecution, and not the actual facts of the case or the guilt or innocence of the accused, that is at issue." (Internal quotation marks omitted.)); *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1980) (in malicious prosecution case against prosecutor, "[m]alice *** is proved by showing that the prosecutor was actuated by improper motives"); see also *Beaman v. Freesmeyer*, 2017 IL App (4th) 160527, ¶¶ 57-58 (in order to find police officer liable in malicious prosecution case when decision to prosecute rests with State's Attorney, plaintiff must show that the "officer pressured or exercised influence on the prosecutor's decision or made knowing misstatements upon which the prosecutor relied"). Malicious prosecution focuses on the state of mind of the defendant at the time the underlying proceedings were commenced. Here, Sanders's acquittal, absent a showing that the prosecution was malicious, does not give rise to any claim. And because Illinois Union's policy covers *malicious* prosecution that "happens" and "takes place" during the policy period, the trigger of coverage is when the wrongful prosecution was commenced.

¶ 44    The majority's attempt to distinguish relevant Illinois authority based on minor differences in policy language is unpersuasive. I find no meaningful difference between Illinois Union's policy language and the language at issue in other Illinois cases, all of which have reached uniform conclusions. For example, in *First Mercury*, a case decided by a different division of this district less than a year ago and very closely analogous to this case, the policy provided coverage for an " 'offense' " (read: malicious prosecution) that was " 'committed' " during the policy period. 2018 IL App (1st) 171532, ¶ 8. Here, the policy covers an occurrence (read: malicious prosecution) "happening" and "taking place" during the policy period. There is no sound reason to reach a polar opposite conclusion regarding the trigger of coverage in this case, particularly since it unavoidably creates a split of authority within this district.

¶ 45    Unlike the majority, I ascribe little weight to the fact that the policy refers to offenses by their "proper, legal names" as opposed to the "underlying wrongful conduct." *Supra* ¶ 20.

¶ 46    First, virtually every liability policy providing coverage for such offenses describes them by their "proper, legal names." See, *e.g.*, *First Mercury*, 2018 IL App (1st) 171532, ¶ 9 (policy referred to the offense of "malicious prosecution"); *Allstate Insurance Co. v. Amato*, 372 Ill. App. 3d 139 (2007) (policy referred to, among other things, offenses of "false arrest," "wrongful entry," "libel," "slander," and "defamation of character" (internal quotation marks omitted)); *John T. Doyle Trust v. Country Mutual Insurance Co.*, 2014 IL App (2d) 121238, ¶ 6 (policy referred to "wrongful eviction," "wrongful entry," and "invasion of the right of private occupancy" (internal quotation marks omitted)); *Dixon Distributing Co. v. Hanover Insurance Co.*, 244 Ill. App. 3d 837, 842 (1993) (policy listed offenses of " 'libel, slander, defamation of character, discrimination, false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation' "). And, to date, no court has used that common language to equate the "occurrence" of these offenses with the accrual of a claimant's right to sue.

¶ 47    Second, as a practical matter, it would be impossible to draft an insurance policy that described all of the possible wrongful acts that could give rise to a claim for such offenses. For example, there are many ways a person can commit the policy's enumerated offense of defamation of character. An insured could publish (by speaking, writing or otherwise disseminating (*Goldberg v. Brooks*, 409 Ill. App. 3d 106, 110 (2011)) a statement that a third

party committed a crime or is infected with a loathsome communicable disease or lacks integrity or ability in the performance of duties of office or employment (*Tunca v. Painter*, 2012 IL App (1st) 093384, ¶¶ 41-42) or otherwise "expose[s] [the third party] to hatred, ridicule, or contempt" by damaging the party's personal reputation, financial reputation, or deterring others from associating with the third party (Restatement (Second) of Torts § 559 cmt. b, c (1977)). And these are by no means all of the ways a person can defame the character of another. The same is true of malicious prosecution. The tort may be committed by the police, the complainant in a criminal case, the prosecution, or a civil litigant. It can involve, among other things, the manufacturing of false evidence, the procurement of false testimony, the withholding of evidence, or the pursuit of a case, civil or criminal, without factual or legal justification or for an improper purpose. A policy that attempted to articulate all of the wrongful acts that could possibly give rise to a claim for one of the enumerated offenses would be verbose in the extreme and, for that reason, unintelligible.

¶ 48     As Illinois Union pointed out at oral argument, the interpretation of the policy adopted by the majority would invite insurers to selectively decline to write or renew insurance once the insured's potential liability for malicious prosecution was raised but before the right to sue— the trigger of coverage according to the majority—accrued. This case is an excellent example. Sanders was charged with murder in 1994. The policy period at issue here is November 1, 2013, through November 1, 2014. By January 2013, in the middle of the previous policy period, Sanders had enough information to file a federal civil rights lawsuit in which he made detailed factual allegations about fabricated and withheld evidence and asserted claims against Chicago Heights and its officers for violations of due process, conspiracy, malicious prosecution, and intentional infliction of emotional distress. Since Sanders had not yet been acquitted after his third trial, he admits his malicious prosecution claim was premature. If the majority's interpretation of the date the "offense" of malicious prosecution occurs under Illinois Union's policy is correct, upon being advised of the federal lawsuit, Chicago Heights' current carrier, believing that it could potentially be on the hook for decades of wrongful incarceration, would likely decline to renew the municipality's insurance. Any other insurer, understanding that it was assuming the risk of an adverse judgment once Sanders was exonerated, would either charge an exorbitant premium, exclude the risk via an endorsement, or refuse to insure the municipality altogether.

¶ 49     Because I conclude that the offense of malicious prosecution occurs, under the language of Illinois Union's policy, when the prosecution is initiated, I would address Sanders's alternative argument that his retrials were additional triggers for coverage. This court rejected an identical argument in *City of Waukegan*, 2017 IL App (2d) 160381, which I find persuasive. There, the insured argued that the State's use of a coerced confession and its continued withholding of evidence during retrials of the claimant, Juan Rivera, were independent acts triggering coverage. *Id.* ¶ 18. We disagreed, stating that "Rivera's second and third trials were continuations of his wrongful prosecution, which increased his damages but were not new injuries." *Id.* ¶ 36. The same holds true here. Retrials are new trials on existing charges; they are not new and separate prosecutions. It is the charging of the claimant, not the trial of the claimant on those charges, that constitutes an "occurrence" for policy purposes. Other language of Illinois Union's policy also supports this result. In its definition of "occurrence," the policy provides that "[a]ll damages arising out of substantially the same offense [(read: malicious prosecution)] regardless of frequency, repetition, the number or kind of offenses ***

will be considered as arising out of one Occurrence." Sanders's initial prosecution and his retrials all arose out of the same false charges against him. As such, the retrials were not independent occurrences triggering coverage.

¶ 50        For these reasons, I would affirm the decision of the trial court.